Filed 6/23/26  P. v. Gutierrez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

    v.

SERGIO GUTIERREZ,

    Defendant and Appellant.

E083374

(Super.Ct.No. RIF2003602)

OPINION

APPEAL from the Superior Court of Riverside County.  Timothy J. Hollenhorst, Judge.  Affirmed in part, vacated in part, and remanded with directions.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Sergio Gutierrez of assault with a deadly weapon and numerous other felonies and misdemeanors arising out of two incidents involving his former

1

girlfriend.  On appeal, Gutierrez contends that the trial court erred by finding that the prosecution did not violate its discovery obligations under Penal Code section 1054.1.  He also contends that even if there was no discovery violation, the court abused its discretion by declining to grant a continuance when the evidence in question came to light.  Gutierrez argues that the trial court also abused its discretion by admitting evidence of prior acts of uncharged domestic violence incidents under Evidence Code section 1109.  (Unlabeled statutory references are to the Evidence Code.)  Finally, the People concede and we agree that the trial court erred by sentencing Gutierrez on a count on which the jury acquitted him.  We accordingly vacate the sentence on that count.  We otherwise affirm.

## BACKGROUND

Gutierrez and Jane Doe were in a romantic relationship for approximately 11 years.  They had two children together, who were six and eight years old in December 2022.

I.      *The charges*

In December 2022, the People charged Gutierrez by amended information with seven felonies and two misdemeanors relating to separate incidents on October 1 and 2, 2020 (counts 1-9).  The People alleged that Gutierrez committed the following felonies on those days:  (1) one count of assault with a firearm (Pen. Code, § 245, subd. (a)(2); count 1); (2) one count of assault with force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4); count 6); (3) two counts of criminal threats (Pen. Code, § 422; counts 2 & 5); (4) one count of false imprisonment by means of violence or menace (Pen.

2

Code, § 236; count 7); and (5) possession of a firearm and ammunition by a felon (Pen. Code, §§ 29800, subd. (a)(1), 30305, subd. (a)(1); counts 3 & 4). With respect to count 1, the information alleged that Gutierrez personally used a firearm. (Pen. Code, § 12022.5, subd. (a).) The information also alleged that Gutierrez committed two misdemeanors in April 2021—one count of violating a protective order (Pen. Code § 166, subd. (c)(1); count 10) and one count of petty theft (Pen. Code, § 488; count 11).

II.     *The relationship*

Doe testified at trial that throughout her 11-year romantic relationship with Gutierrez the couple frequently broke up and later reunited. She described him as jealous and "very controlling." He verbally abused her when they argued, calling her a "stupid bitch, things like that." Gutierrez knew the passcode to Doe's phone and regularly demanded to check the phone. He physically took her phone away "[a] lot of times." When he was "very angry," he would break her phone by throwing it on the ground. He did that to about 10 of her phones.

Before October 2020, Doe also twice checked Gutierrez's phone because she suspected him of cheating on her, which upset her. She found text messages from other women.

Doe once ended the relationship because she believed that Gutierrez was using methamphetamine. She did not see him use it, she believed that he used it because she knew how methamphetamine affected other people whom she knew used it. Gutierrez's "whole demeanor would change" when he was using methamphetamine. He would "become very aggressive" and "very paranoid."

3

Doe described one incident in which Gutierrez lit the sleeve of one of her jackets "on fire with a lighter" during an argument. She was not wearing the jacket at the time; it was hanging in her closet and "sticking out." She responded by asking him, "[W]hat are you doing? You're going to light the whole room on fire." When asked at trial how she put out the fire, Doe explained: "It didn't completely light on fire, like it just started to melt down, so it put out itself."

Doe testified that Gutierrez was verbally and physically aggressive when he was using methamphetamine. He threatened her approximately three times, telling her, "'I'm going to hurt you,'" and he sometimes followed those threats with physical violence. Sometimes he would grab her by the arm and bring her back into the room when she tried to walk out during an argument. Gutierrez did that to Doe more than five times but less than 20. He may have left marks on her, because she has "very sensitive skin."

The prosecutor asked Doe if Gutierrez ever did anything more than just grab her arm, and she replied in the affirmative but "couldn't say when." The prosecutor asked what type of things Doe was talking about, and she responded, "Like punch me." Asked when that happened, she answered, "I couldn't tell you." On cross-examination, Doe confirmed that Gutierrez had punched her, but she never told anyone about it, because she was embarrassed. Doe acknowledged that she had previously testified under oath that Gutierrez never punched her, but she now said that was a lie.

III. *The October 2020 incidents*

Gutierrez and Doe had broken up and were not living together immediately before October 2020, when they resumed contact. On the night of October 1, he went to her

4

apartment and brought a bag filled with clothes and a rifle case.  Doe believed that Gutierrez was under the influence of methamphetamine because he was acting "very paranoid," believed someone was looking for him, and was "not making sense."

Gutierrez demanded that Doe give him her phone, and she refused.  He eventually took her phone out of her hand, but he did not know her new password.  He became upset when he realized that he did not have the password, and he started yelling at her, demanding that she tell him the password.  She refused, and he "became more angry and angry."

As Doe and Gutierrez continued to argue, he grabbed his rifle case and opened it.  They were in Doe's bedroom, where their children were sleeping.  Gutierrez took out the rifle and started assembling it, which took him a few minutes.  Doe froze and told Gutierrez to put the gun away.  When the rifle was assembled, he pointed it at her and said, "'I'm going to kill you if you don't give me your password.'"  Doe was afraid and believed that Gutierrez might shoot and kill her.  She asked him if he was "'really going to kill [her] in front of the kids.'"

Gutierrez put down the gun.  He and Doe then moved into the living room, where they continued arguing, and he brought the gun with him.  Gutierrez and Doe eventually fell asleep, and Doe awoke at 6:00 a.m. the next morning to go to work.  Gutierrez and their children were also awake.  Gutierrez continued the previous night's argument and demanded that Doe tell him the password for her phone.  Doe told Gutierrez that she was going to work, but Gutierrez told her that she "wasn't going to go anywhere."  He took her keys and stood in front of the door to prevent her from leaving the apartment.

Doe went into the children's bedroom while she and Gutierrez continued to argue. He grabbed her, put her in a headlock, and tossed her onto a bed, which hurt her neck. Doe started crying. Gutierrez warned her that if she did not stop crying, then he would place a pillow over her face.

At some other point that morning, Gutierrez took out a pocketknife while Doe was seated on the couch. Gutierrez stabbed the knife into the couch's armrest while telling Doe, "'That could be you.'" Doe took that as a threat.

Doe found her daughter's phone and called 911. The prosecution played a recording of the 911 call and provided the jury with a transcript. Doe initially told the dispatcher that Gutierrez was in another room with a gun, and she asked the dispatcher to "[p]lease hurry up." Doe repeatedly said that Gutierrez was "gonna hurt me" if he came into her room. The dispatcher asked Doe if Gutierrez had already hit her, and Doe answered, "Yes, he almost broke my neck right now."

Gutierrez came into the room while Doe was on the phone, and Doe put the phone in her back pocket. Gutierrez asked her who had called, and he repeatedly told Doe, "Fuck you," "Fuckin' hate you," and "Fuck your family." Doe told Gutierrez: "I didn't do anything to you. Almost frickin' broke my neck." Gutierrez refused to give Doe her phone.

Gutierrez left the apartment while Doe was on the call with the 911 dispatcher. Doe gave the dispatcher Gutierrez's date of birth and physical description: 5 foot 10 inches tall, medium build, bald, Hispanic, male, with tattoos. She said that Gutierrez was wearing a black shirt and black pants.

6

Doe told the dispatcher that Gutierrez left on foot and was carrying his gun, which Doe described as "like a hunting rifle." She said that the disassembled gun was inside a shiny silver case that looked like a suitcase. Doe confirmed that Gutierrez also had a three-inch pocketknife, and she told the dispatcher: "He stabbed my couch." The dispatcher asked Doe if Gutierrez had threatened to kill anyone, and she answered, "Just me."

Doe also told the dispatcher that Gutierrez had put her "like in a head lock" and "he was like cracking [her] neck." She also said that he had pointed the same gun at her the day before. Doe ended the call when sheriff's deputies arrived at her apartment.

IV. *The investigation*

Sheriff's deputy Crystal Ducouer responded to the 911 call and was designated as the primary deputy. As the primary deputy for the incident, Ducouer was responsible for conducting the investigation and writing a report about it. Ducouer spoke with Doe. Doe "was crying," "seemed scared," and "was willing to talk to [law enforcement] about what happened."

When cross-examined at trial, Doe testified that she told law enforcement that Gutierrez had not previously physically assaulted her. But she testified on redirect that she did tell law enforcement that Gutierrez previously had been violent and threatened her. She confirmed that she told law enforcement that Gutierrez "lit her sweater on fire."

Sheriff's investigator Scott Anderson also responded to the 911 call. While Anderson was en route, he learned that the suspect might have left the apartment on foot and taken his rifle with him in a case. Upon learning that information, Anderson

7

coordinated with other responding deputies to meet at the front of the apartment complex. A deputy drove a patrol car into the complex and acted as a moving barricade to protect the remaining deputies who were following on foot. Law enforcement made contact with Doe and secured the apartment. Anderson described Doe as "pretty alarmed" and "very nervous."

From Anderson's experience, he knew that the apartment complex had surveillance cameras. With management's permission, Anderson viewed the footage on scene in a room with a screen, a DVR, and a mouse to control the cameras. The surveillance cameras were high-definition and provided "excellent" quality footage.

Anderson viewed recordings from Doe's apartment building around when she called 911 and "saw a subject walking from the area of the apartment with a gray case" and a black bag. Anderson described the subject as a Hispanic man with a bald head and "a uniquely cut or trimmed beard" who was wearing a black t-shirt and black pants. Anderson got a "clear view" of the person exiting the apartment building. Anderson broadcast what he saw on the surveillance footage to the other deputies to assist them in searching for Gutierrez. At trial, Anderson testified that the person shown exiting the apartment in the surveillance footage appeared to be the same person shown in Gutierrez's booking photograph.

The surveillance footage also showed Gutierrez walking out of the camera's view and then returning without the silver case and the black bag. Anderson searched the area where Gutierrez was out of the camera's view and found a gun case that looked identical to the case that Gutierrez had been carrying. The case contained a disassembled AR-15-

8

style assault rifle, including a magazine containing ammunition and three more live rounds of ammunition loaded inside the rifle.

V.      *The April 2021 incident*

In December 2020, Gutierrez was served in court with a criminal protective order that prohibited him from having any contact with Doe.  In April 2021, Doe contacted Gutierrez, so Gutierrez went to Doe's apartment and spent the night.  Doe searched Gutierrez's phone and found videos of Gutierrez with another woman who was pregnant, so Doe took the children and went to her brother's house.  She left Gutierrez unsupervised at her apartment.  Gutierrez subsequently texted Doe, "'Thanks for the TV.'"  Doe had two televisions in her home, one 55-inch flatscreen in the living room and one 50-inch flatscreen in her bedroom.  When Doe returned home later that day, the 55-inch television was missing, and the 50-inch television was on the floor and broken. Doe called 911.

VI.     *The verdict and sentencing*

The jury convicted Gutierrez of possession of a firearm and ammunition by a felon, false imprisonment, and assault with a firearm.  (Pen. Code, §§ 236, 245, subd. (a)(2), 29800, subd. (a)(1), 30305, subd. (a)(1); counts 1, 3, 4, & 7.)  The jury found true the allegation that Gutierrez personally used a firearm in committing the assault offense. (Pen. Code, § 12022.5, subd. (a).)

The jury could not reach a verdict on the remaining felony counts of criminal threats and assault with force likely to cause great bodily injury.  (Pen. Code, §§ 245, subd. (a)(4), 422; counts 2, 5, & 6.)  The court declared a mistrial as to those counts, and

9

the People subsequently dismissed them.  (Pen. Code, §§ 245, subd. (a)(4), 422; counts 2, 5, & 6.)  The jury acquitted Gutierrez of misdemeanor petty theft (Pen. Code, § 488; count 11) and convicted him of the remaining misdemeanor offenses (Pen. Code, §§ 166, subd. (c)(1), 243, subd. (e)(1), & 594, subd. (a); counts 8-10).

The court sentenced Gutierrez to an aggregate term of 15 years in state prison, consisting of consecutive terms for each of the felony convictions and the firearm enhancement.  The court sentenced Gutierrez to concurrent terms for the misdemeanor convictions, including a 180-day concurrent sentence for count 11.

## DISCUSSION

I.      *Discovery violation*

Gutierrez contends that the prosecution violated its discovery obligations under Penal Code section 1054.1 and that the trial court erred by finding to the contrary and failing to grant any relief for the violation.  He also contends that regardless of whether there was a discovery violation, the trial court abused its discretion and violated his right to due process by declining to grant a continuance when the evidence in question was disclosed during trial.  We conclude that there was no discovery violation, and the court did not abuse its discretion by denying Gutierrez's request for a continuance.

A.      *Legal framework*

Under Penal Code section 1054.1, the prosecution is obligated to disclose to a criminal defendant and defense counsel "[a]ny exculpatory evidence," "[a]ll relevant evidence seized or obtained as a part of the investigation of the offenses charged," and any "[r]elevant written or recorded statements of witnesses or reports of the statements of

10

witnesses whom the prosecutor intends to call at the trial" if that evidence "is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies."  (Pen. Code, § 1054.1, subds. (c), (e), (f).) Absent a showing of good cause, those disclosures must be made within 30 days before trial, but "[i]f the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately." (Pen. Code, § 1054.7.)

Upon a showing that the prosecution failed to comply with its disclosure obligations under Penal Code section 1054.1, the "court may make any order necessary to enforce" that provision, "including, but not limited to … delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order."  (Pen. Code, § 1054.5, subd. (b).)  "Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure."  (*Ibid.*)

"We generally review a trial court's ruling on matters regarding discovery under an abuse of discretion standard."  (*People v. Ayala* (2000) 23 Cal.4th 225, 299; *People v. Prince* (2007) 40 Cal.4th 1179.)  "In particular, 'a trial court may, in the exercise of its discretion, "consider a wide range of sanctions" in response to the prosecution's violation of a discovery order.'"  (*Ayala*, at p. 299.)

11

B. *Relevant proceedings*

Trial began on December 1, 2022, and was estimated to last seven days. The court summoned prospective jurors and began questioning them about hardships and availability. The following day, the court held a pretrial hearing on the parties' motions in limine.

At the outset of the pretrial hearing, the prosecutor informed the court that in preparing for trial he doublechecked with Anderson to confirm that he had never written a supplemental report related to the investigation. Anderson said that he had not, but he checked the report that Ducouer wrote as the primary deputy. After reviewing Ducouer's report, Anderson asked the prosecutor if he knew that there was "surveillance at the scene, although the surveillance was not booked by anyone." The prosecutor was not aware of the surveillance. Anderson told the prosecutor that he had used the apartment complex's surveillance footage at the scene, and it assisted him in locating the rifle. The prosecutor told the court that Anderson's description "did include that he was directing other deputies over the dispatch where to look and what was happening as he was watching the surveillance. That is consistent with what's on the CAD log." The prosecutor had given defense counsel the CAD log earlier in the proceeding. The CAD log was not admitted in the trial court and is not part of the record on appeal.

The prosecutor explained: A "CAD log refers to the computer-aided dispatch. It is the printout that is being generated in realtime as 911 operators, the dispatchers are taking 911 calls, having law enforcement respond to the scene, anything that's happening over the radio during that exchange before they clear the scene so that the

12

CAD log will give some description about what the 911 caller said, the situation, what units are dispatched to the area.

"And in this particular instance also provides additional detail from Investigator Anderson as he's narrating that he sees cameras, that he's going to try to find them, that he has located them, and that he sees the possible subject, and then begins narrating the tracking that subject, both in what the subject looks like, it goes into some fairly specific details talking about, you know, the …. [¶] Subject has lower half of jawline, has dark beard, shaved clean on the top. So it does provide some fairly descriptive information about the person that he is observing, as well as that the subject is seen carrying a silver case and black bag, and then where he sees that subject going. So it is consistent with what Investigator Anderson indicated to me on the phone."

The prosecutor informed the court that Anderson had just located a recording from a body-worn camera that he was wearing during the incident that also was not previously booked. The prosecutor stated that he informed defense counsel about the recording as soon as he learned of it.

Before the hearing, the prosecutor received copies of four body-worn camera recordings, which he brought to the hearing. The recordings were labeled and separated into the following topics: (1) Anderson's arrival at the scene, (2) an interview of Doe by Anderson and Ducouer, (3) "locating property and video surveillance," and (4) "video surveillance." (Initial capitalization omitted.) The prosecutor, defense counsel, and the court all watched the fourth recording and attempted to watch the third, but it did not work. The prosecutor said he would attempt to get it repaired.

13

The court noted that upon learning of the "potential evidence," defense counsel requested a continuance of the trial. The court was tentatively inclined to deny the request "because the defense was aware that this surveillance was at least utilized to assist law enforcement in locating the alleged firearm and clothing."

Defense counsel orally moved for several types of relief. Counsel sought to exclude both Anderson's body-worn camera footage and "anything that is referenced in that body cam," including "the surveillance if it [was in] the missing track" and "any reference to the surveillance tape or any playing of the surveillance tape." Counsel alternatively moved for a continuance of the trial because of the late disclosure of information, including the body-worn camera footage.

Defense counsel stated that when he announced ready for trial, he believed that Anderson "had nothing of significance to say about finding the gun and that there was no other relevant portion of his testimony other than that was referenced in the report, which said Detective Anderson found the gun." Counsel acknowledged "that perhaps the CAD log, if seen in the best light possible, may have made reference to some surveillance tape." But counsel argued that was "a far stretch from actually providing the body cam … and actually seeing the surveillance tape." Defense counsel did not believe that the prosecutor had intentionally withheld the information.

Defense counsel also argued that evidence that showed Gutierrez possessing the gun would "dramatically change[] the defense strategy" because (1) the only other evidence that Gutierrez possessed a firearm was Doe's testimony, and (2) she had "a strong motive to at least exaggerate" because of Gutierrez's infidelity. The defense had

14

consequently planned to argue that Doe "falsely accused [Gutierrez] of pointing a gun at her." Counsel argued that a continuance would allow him to answer some questions about whether the surveillance footage was still available and why Anderson did not book the body-worn camera recordings into evidence.

The court stated that it did not believe that Gutierrez would suffer any prejudice without a continuance, reasoning: "It's clear to the Court that the CAD log discussed this surveillance video that was clearly utilized by the investigating officer to locate this paraphernalia. And also there is an indication that in this video there is somebody, whether or not it was [Gutierrez] or not, that's still up for debate, … who is dropping it back off. But the defense was aware of this potential video."

During another hearing later that day, the prosecutor provided the court and defense counsel with the entire content of the body-worn camera recordings to view. According to the prosecutor, the remaining recording "only capture[d] approximately the lower two-thirds of the screen that was showing the surveillance for the vast majority of the video." The surveillance footage that Anderson was watching was not visible on the body-worn camera recording. The prosecutor did not plan to play any of the body-worn camera footage at trial.

Defense counsel again requested a continuance, arguing that the evidence materially changed the defense strategy. Counsel characterized the CAD log provided to the defense during discovery as "obscure."

The court denied the continuance request. The court reasoned that the CAD log gave the defense notice that Anderson located the firearm "based on the surveillance

15

video."  The court disagreed with defense counsel's characterization of the CAD log as follows:  "Upon review of the CAD log, which we all did, there is specific information, specific information given regarding the deputy's observations of watching the surveillance camera."  Given that the prosecution had already produced evidence disclosing that there was surveillance video that was used at the scene, the court did not believe that it was "new information," prejudicial, or violated Gutierrez's right to due process.  As to the body-worn camera recordings, the court found it "bothersome" that everyone was learning of those so late but did not blame the prosecutor, because the recordings were not booked into evidence and were not referenced in any report.

The court set a section 402 hearing to explore and possibly limit the scope of Anderson's testimony regarding the surveillance footage at trial.  At the hearing, Anderson testified, as he did at trial, about how he accessed, watched, and utilized the surveillance footage at the apartment complex and how it assisted him in finding the firearm that was discarded by the person who came out of Doe's apartment.  Anderson testified that he never saw Gutierrez in person but looked at his booking photograph and immediately recognized him as the person in the surveillance footage.  Anderson added: "But to say 100 percent, no."

After Anderson testified, defense counsel again argued for a continuance based on the "newly discovery evidence."  Had counsel known about the body-worn camera footage, he believed that it would have affected his ability to convince Gutierrez "that perhaps taking a deal [was] in his best interest."  Defense counsel argued that the CAD log was "obscure" and written "in code, in sentence fragments, in abbreviations," so it

16

was "choppy," "not straightforward," and "difficult to discern whether or not the person is actually seeing this or is being told by this."

The court noted that it had already denied the continuance request and again said that a continuance was not warranted and that Gutierrez's right to due process was not violated. The court explained that there was "a CAD log, and perhaps CAD logs could be better written and they could be more articulate and better documented, but there was a CAD log in this case that talked about this very issue, and it was provided to the defense. [¶] So I don't see any issue with this discovery. I'm not going to give the late discovery violation instruction. I'm not going to grant a continuance."

After the jury reached its verdict, the defense moved for a new trial on numerous grounds, including "because the defense was given late discovery and the court denied defense requests for dismissal, exclusion of evidence, continuance, or late discovery instruction." (Bold & italics omitted.) The trial court denied the motion on the ground that there had been no late discovery.

C.     *Discovery violation*

Gutierrez contends that he was prejudiced by the late disclosure of (1) the fact that Anderson watched surveillance footage, (2) the body-worn camera recordings of Anderson watching the footage, and (3) the facts depicted in the surveillance footage, namely, that a person who looked like Gutierrez exited the apartment building with a bag and a case and that Anderson located the rifle by watching the footage and searching the area where the person went out of the camera's view.

17

Gutierrez argues that "the trial court erred by finding that there was no discovery violation because it found that defense counsel was on notice about this information regarding the surveillance video based upon some obscure abbreviated references in the middle of the CAD log." He also argues that the trial court erred by declining to grant a continuance under Penal Code section 1054.5 as a remedy for the discovery violation, failing to instruct the jury with CALCRIM No. 306, and denying his motion for new trial. The arguments lack merit.

There was no discovery violation. The prosecution complied with Penal Code sections 1054.1 and 1054.7. The prosecutor was obligated to disclose the body-worn camera recordings to the defense under Penal Code section 1054.1. (Pen. Code, § 1054.1, subds. (c), (e)-(f).) The prosecutor learned of those recordings on the first day of trial and thus was required to disclose the information immediately, which the prosecutor did. (Pen. Code, § 1054.7.) Upon learning of the existence of the recordings from Anderson, the prosecutor immediately informed defense counsel about their existence and provided copies at the hearings the following day. Defense counsel did not argue otherwise. On the contrary, both defense counsel and the court acknowledged that the prosecutor was not at fault for the late discovery. The prosecution fulfilled its statutory disclosure obligation by immediately disclosing material and information that became known within 30 days before trial. (Pen. Code, § 1054.7.) We accordingly conclude that trial court did not err by finding that there was no discovery violation.

The trial court based its ruling on the defense's possession of the CAD log, which apparently contained some reference to the surveillance footage. We need not address that rationale, because we review the trial court's ruling, not its reasoning. We will not disturb a trial court's ruling "merely because it was given for a wrong reason, if the ruling would otherwise be correct ""'upon any theory of the law applicable to the case,'"" and ""'regardless of the considerations which may have moved the trial court to its conclusion.'"""" (*People v. Hopson* (2017) 3 Cal.5th 424, 459.)

Because there was no discovery violation, Gutierrez was not entitled to any relief under Penal Code section 1054.5, subdivision (b). The trial court therefore did not err by declining to grant a continuance under that provision or by failing to instruct the jury with CALCRIM No. 306.[1] (Pen. Code, § 1054.5, subd. (b).) Moreover, because the trial court did not err by finding that there was no discovery violation, the trial court did not err by rejecting Gutierrez's argument that the violation warranted a new trial. (Pen. Code, §§ 1054, subd. (b), 1181, subd. 5.)

For the foregoing reasons, we conclude that the trial court did not err by concluding that prosecution did not violate its disclosure obligations under Penal Code section 1054.1. We accordingly also conclude that the court did not abuse its discretion or err by not granting Gutierrez any form of relief under Penal Code section 1054.5,

---

[1]     We note that there is no indication in the record that Gutierrez requested that the court instruct the jury with CALCRIM No. 306. The first mention of a late discovery instruction is the court's statement that it would not give such an instruction because there was no discovery violation.

subdivision (b), to remedy the alleged violation or by denying the motion for new trial based on the alleged violation.[2]

D. *Continuance*

Gutierrez argues that regardless of any possible discovery violation, the trial court abused its discretion and violated his due process rights by not granting a continuance of the trial in light of the newly disclosed information and evidence. We disagree.

The trial court is vested with discretion to continue a criminal trial upon a showing of good cause. (Pen. Code, § 1050, subds. (b)-(c), (e); *People v. Reed* (2018) 4 Cal.5th 989, 1004 (*Reed*).) "In making that determination, courts consider whether the moving party has acted diligently, the anticipated benefits of the continuance, the burden that the continuance would impose on witnesses, jurors, and the court, and whether a continuance will accomplish or hinder substantial justice." (*Reed*, at p. 1004) The trial court's "denial of a continuance may be so arbitrary as to deny due process." (*People v. Beames* (2007) 40 Cal.4th 907, 921 (*Beames*).) There is no mechanical formula for determining whether the denial rose to the level of a due process violation. (*Ibid.*) "Instead, '[t]he

---

[2]     Gutierrez contends that "if this court finds that the trial court did not err in denying [Gutierrez's] requests because the references in the CAD log put defense counsel on notice of the existence of the surveillance video" or "there was no discovery violation because defense counsel had notice of a need to investigate to determine if there was a surveillance video," then he did not forfeit the argument for review because his trial counsel rendered ineffective assistance by "failing to investigate further to determine whether there was a surveillance video that Anderson had reviewed and determine what Anderson claimed he saw in the video." We need not address the argument, because the CAD log has nothing to do with our basis for concluding that the court correctly determined that there was no discovery violation.

answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.'" (*Ibid.*)

We review for abuse of discretion the trial court's ruling on a request for a continuance. (*Beames*, *supra*, 40 Cal.4th at p. 921.) In addition, "we review all circumstances relevant to the motion to determine whether the trial court's decision was so arbitrary as to deprive the movant of due process." (*Reed*, *supra*, 4 Cal.5th at p. 1004)

The trial court did not abuse its discretion by denying Gutierrez's request for a continuance. The request was made after jury selection had begun. Moreover, the prosecutor stated that he did not intend to offer the body-worn camera recordings into evidence. Although defense counsel argued that he needed a continuance to discuss possible plea options with Gutierrez, he did not explain why he could not do that during trial, or if the prosecution was even willing to negotiate.

In addition, defense counsel had prior notice that Anderson had viewed surveillance footage at the scene, which assisted Anderson in finding the rifle case and its contents. Although the CAD log is not included in the record on appeal, the court, the prosecutor, and defense counsel all stated that they had reviewed it. It is undisputed that the CAD log was timely provided to the defense before trial. The CAD log included information that Anderson was watching surveillance footage on the scene and saw a possible suspect who matched Gutierrez's description. The CAD log also stated that the person was carrying a bag and a case, and it described how Anderson was able to locate the rifle case based on the surveillance footage.

21

Under these circumstances (i.e., the prior disclosure of the CAD log, the fact that the surveillance footage was not going to be introduced at trial, and the absence of any evidence that a continuance for plea negotiations would be either necessary or fruitful), we conclude that the trial court did not abuse its discretion or violate Gutierrez's due process rights by denying his request for a continuance.

II.    *Prior acts evidence*

Gutierrez contends that the trial court prejudicially abused its discretion by admitting evidence of prior uncharged acts of domestic violence that Gutierrez committed against Doe.  We are not persuaded.

A.    *Relevant proceedings*

Before trial, the People filed a motion in limine to admit evidence under sections 1109 and 352 concerning prior uncharged acts of domestic violence that Gutierrez committed against Doe.  At the preliminary hearing, Doe testified that in 2016 Gutierrez grabbed her sweater, took her cell phone, and then broke it, and the prosecution sought to introduce evidence of those acts at trial.  Gutierrez moved in limine to exclude evidence of "violence on the part of Mr. Gutierrez, other than on the night of the alleged crime," on the ground that it was "irrelevant, prior bad character or bad acts evidence, which is overly prejudicial and speculative."  The trial court ruled that evidence about the 2016 incident was admissible under section 1109, finding the probative value low but the prejudicial effect "even lower."

The court subsequently held a section 402 hearing in order to get "additional details about what prior violence or violent conduct [Doe] was aware of or believed

22

had—[Gutierrez] had been doing prior to October 2nd of 2020." Doe testified at the hearing. In the year leading up to the October 2020 incidents, Gutierrez became increasingly violent. He would grab Doe's arm and physically prevent her from leaving a room. Doe could not recall how many times that happened. Gutierrez would "say very foul things" to Doe, calling her "bitch and stuff like that." He also previously threatened to kill her, possibly more than once.

Doe said that Gutierrez set her sweater on fire several years earlier. (At trial, Doe described the item of clothing as a jacket, not a sweater.) They were arguing, he was under the influence of drugs, and he just decided to set a sleeve of her sweater on fire. The sweater was hanging in a closet. Doe could not recall exactly what happened. Gutierrez had never set anything else on fire. That incident shaped her belief that his October 2, 2020, threat to kill her was sincere.

On cross-examination, Doe testified that Gutierrez never bruised her or left marks on her. He also never punched, kicked, strangled, or used any weapon against her, including a firearm.

The prosecutor argued that all of the evidence about Gutierrez's prior uncharged violent acts should be admissible under section 1109, because the acts were similar to the charged offenses and thus were potential propensity evidence. Before defense counsel replied, the court stated that it did not have any concerns about the evidence's admissibility under section 352 because the evidence was "clearly probative," not unduly prejudicial, and would not inflame the jury or take an undue consumption of time.

23

Defense counsel argued that he had "a little problem" with the evidence about setting the sweater on fire because it was "actually inflammatory" in that it seemed a "little more prejudicial." The prosecutor disagreed, and the court asked defense counsel if he wanted to make any additional arguments about excluding the evidence generally. Defense counsel merely reiterated that he believed that the evidence about the sweater should be excluded.

The court ruled that the prior acts evidence was admissible, finding that the probative value of the evidence was not substantially outweighed by undue prejudice. The court reasoned: "There are general details given about prior incidents where the defendant would grab the alleged victim's arm, he would physically prevent her from leaving rooms. The conduct was with her only. There were prior allegations of threats to kill, again, with her only. She does not have any bruises or documentation to show any of these past incidents. There is also an allegation of the defendant allegedly lighting a sweater on fire. I think all of that is probative, and I don't think that that probative value of that evidence is substantially outweighed by undue prejudice."

B.      *Analysis*

In general, "evidence of a person's character … is inadmissible when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).) The general prohibition against admitting propensity evidence is subject to the exception set forth in section 1109, which provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not

24

inadmissible pursuant to Section 352." (§ 1109, subd. (a); *People v. Baker* (2021) 10 Cal.5th 1044, 1089 (*Baker*).)

Section 352 provides that a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against [the] defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Bolin* (1998) 18 Cal.4th 297, 320; *People v. Barrett* (2025) 17 Cal.5th 897, 954-955 (*Barrett*).)

In analyzing whether to admit evidence of prior acts of domestic violence, "the trial court's determination should be guided by such factors as the 'nature, relevance, and possible remoteness' of the evidence, 'the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other [uncharged] offenses, or excluding irrelevant though inflammatory details surrounding the offense.'" (*People v. Dworak* (2021) 11 Cal.5th 881, 900; *People v. Thomas* (2021) 63 Cal.App.5th 612, 630 (*Thomas*).) ""'"The principal factor affecting

the probative value of an uncharged act is its similarity to the charged offense.""'" (*Thomas*, at p. 630.)

We review for abuse of discretion the trial court's admission of prior acts evidence under sections 1109 and 352. (*People v. Robinson* (2024) 99 Cal.App.5th 1345, 1351.) We will not reverse the trial court's decision "'*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124, overruled on another ground in *People v. Leon* (2020) 8 Cal.5th 831, 848.)

The People argue that Gutierrez forfeited any objection to admission of Doe's testimony that Gutierrez punched her, because he did not object at trial. Evidentiary objections not made in the trial court generally will not be considered on appeal. (§ 353, subd. (a); *People v. Flinner* (2020) 10 Cal.5th 686, 726-727.) Gutierrez did not object to Doe's testimony at trial that he had previously punched her. Moreover, the trial court did not have an opportunity to rule on the admissibility of the evidence at the section 402 hearing because Doe denied that Gutierrez had ever punched her. By failing to object in the trial court, Gutierrez forfeited any objection to the admissibility of Doe's testimony about Gutierrez punching her. (*Flinner*, at pp. 726-727; *People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1314.)

Gutierrez contends that he preserved his objection to the admission of the evidence that he previously punched Doe, because he moved before trial to exclude any evidence of prior uncharged acts of violence. "A motion in limine can preserve an appellate claim, so long as the party objected to the specific evidence on the specific ground urged on

appeal at a time when the court could determine the evidentiary question in the proper context." (*People v. Solomon* (2010) 49 Cal.4th 792, 821.) Gutierrez's motion in limine sought generally to exclude all evidence of prior violence; it did not mention any specific acts. The motion was therefore insufficient to preserve Gutierrez's challenge on appeal to the admissibility of Doe's testimony that he punched her. (*Ibid.*)

Gutierrez also contends that any objection to the evidence would have been futile. A criminal defendant need not object in the trial court in order to preserve an argument on appeal if the objection would be futile. (*People v. Arias* (1996) 13 Cal.4th 92, 159.) Nothing in the record indicates that an objection would have been futile here. When the trial court admitted the section 1109 evidence, the court considered each of the uncharged acts of violence that Doe testified about at the section 402 hearing, and the court's reasoning was expressly based on the nature of those specific acts, the amount of time that presentation of the evidence would consume, and so forth. Nothing about the ruling suggests that the trial court had made a general determination that all uncharged acts of prior violence were admissible.

The trial court did not abuse its discretion by admitting Doe's testimony about Gutierrez setting fire to her jacket (which she had described as a sweater at the section 402 hearing). Gutierrez was charged with two counts of criminal threats, assault with a firearm, and assault with force likely to produce great bodily injury. The uncharged act of setting Doe's jacket on fire was similar to the charged offenses in that it was committed against the same victim. (See *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1029.) And the uncharged conduct was similar to the charged offense of the criminal

27

threat made with the knife, because both involved Gutierrez allegedly destroying property as a means of threatening Doe. (*Thomas*, *supra*, 63 Cal.App.5th at p. 630.) The uncharged act therefore tended to bolster Doe's credibility concerning her claim that Gutierrez stabbed the couch when he threatened to kill her, and Doe's credibility was crucial to the prosecution's case. Moreover, the evidence supported an inference that Gutierrez had a propensity to act in a violent and threatening manner toward Doe when the couple argued. The evidence of the uncharged act therefore was relevant and probative of Gutierrez's guilt of the charged offenses. (*Baker*, *supra*, 10 Cal.5th at p. 1089 ["a defendant's propensity to commit … domestic violence is not an extraneous factor; it is relevant to the guilt of the accused—and evidence tending to show that propensity has probative value"].)

In light of the probative value of the evidence, the trial court did not abuse its discretion by concluding that the possible danger of undue prejudice did not outweigh the probative value of the evidence. (§ 352.) The evidence that Gutierrez once set fire to Doe's jacket while she was not wearing it was no more inflammatory than evidence of the charged offenses and other admitted uncharged acts of violence. With respect to the October 2020 incidents, Doe testified that: (1) Gutierrez pointed a rifle directly at her and threatened to kill her; (2) Gutierrez stabbed a knife into the armrest of the couch on which Doe was seated and warned Doe that the couch could be her; (3) Gutierrez hurt her neck by grabbing her, putting her in a headlock, and throwing her onto a bed in front of their two young children; (4) Gutierrez threatened to place a pillow over Doe's face; and (5) Gutierrez physically prevented Doe from leaving the apartment. Moreover, even

28

setting aside the evidence that Gutierrez had punched Doe in the past, the record contains other evidence of uncharged acts of violence that Gutierrez does not challenge on appeal, such as evidence that he grabbed her by the arm on multiple occasions and repeatedly threatened to hurt her. And the evidence about the jacket was not particularly inflammatory; Doe testified that the jacket barely melted and was not "completely … on fire," and the fire died without intervention. Given all of the other evidence of violence that Gutierrez allegedly committed against Doe, the evidence about the jacket was not likely to evoke any more emotional bias against him than the evidence of the charged offenses. (*People v. Loy* (2011) 52 Cal.4th 46, 62.) Moreover, the trial time taken by the uncharged acts evidence was minimal. The prosecutor asked Doe seven questions about the incident, and the questions and answers occupy less than one full page of reporter's transcript out of a total of 40 pages of Doe's testimony.

Gutierrez's arguments to the contrary are unavailing. First, he contends that the only similarity between the act of setting the jacket on fire and the charged offenses is that Doe said that Gutierrez was under the influence of drugs during both incidents. The argument fails both because that is not the only similarity and because the evidence was relevant and probative for reasons we have already explained.

Second, Gutierrez contends that the evidence about the jacket incident was at least as inflammatory as the evidence of his other violent acts, "because lighting a jacket on fire as it is hanging in a closet, which closet contains other clothing, is very dangerous because obviously the fire could easily quickly spread to other clothing or to the closet wall and it could quickly cause the closet and thus, the apartment to catch fire; such a fire

29

could also injure anyone present." The argument mischaracterizes the evidence about the jacket and is based on speculation and conjecture, not reasonable inferences that the jury could draw from the evidence. Doe testified that the jacket barely melted and was not completely on fire, and the fire extinguished on its own. There was no evidence that there were flames threatening to engulf anything, let alone an apartment building, or that Doe even lived in an apartment building when the incident occurred.

Third, Gutierrez argues that the evidence of the jacket incident is too remote to be probative because it happened "'a few years'" earlier. The argument fails because "'a few years'" is not particularly remote. Moreover, the remoteness would not render the evidence unduly prejudicial given the similarity between the prior act and the charged offense in which Gutierrez damaged property in the course of assaulting and threatening Doe. (See *People v. Hernandez* (2011) 200 Cal.App.4th 953, 968 [collecting cases in which the passage of 20 to 40 years did not render prior acts evidence too remote under section 1108].)

Fourth, Gutierrez contends that the jury would have been tempted to punish him for the prior act because "he had previously escaped" punishment for it. We disagree. The risk that the jury might punish Gutierrez for the uncharged act of once setting an unworn jacket sleeve on fire was minimal, given how little testimony there was about the prior act, the relatively minor nature of the incident compared with all of the other charged and uncharged acts, and the lack of evidence of damage caused by the incident.

Fifth, Gutierrez argues that admission of the evidence caused an undue consumption of time, including the time needed for Gutierrez to address it in his defense.

30

The argument is not supported by the record. As we have explained, the trial time taken by the uncharged acts evidence was minimal. In closing argument, defense counsel pointed out Doe's inconsistencies concerning other acts of violence, and with respect to the jacket incident he stated: "There was an issue of whether or not she raised lighting the sweater on fire, but she was very clear there were no prior physical assaults." There was no undue consumption of time.

Finally, Gutierrez argues that "the likely prejudicial impact on jurors from the admission of the evidence of the prior alleged lighting the sleeve of [Doe's] jacket on fire … was high especially in light of the jury instruction that they could use the uncharged conduct as propensity evidence …." The argument lacks merit. The prior acts evidence was relevant and probative, so it therefore was prejudicial in that it tended to prove Gutierrez's guilt. (*Barrett*, *supra*, 17 Cal.5th at p. 954.) But that is the sort of prejudice that arises from any evidence tending to show guilt, and it is not the type of prejudice that "'section 352 [was] designed to avoid.'" (*Ibid.*)

For the foregoing reasons, we conclude that the trial court did not err by admitting evidence that Gutierrez set Doe's unworn jacket on fire. Because there was no error in admitting the evidence, the admission of such evidence also did not amount to a due process violation because it did not render the trial fundamentally unfair. (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.)

III.    *Count 11*

Gutierrez contends, and the People concede, that the 180-day sentence imposed for count 11 must be vacated because the jury acquitted him of that offense. We agree.

The sentence imposed on count 11 is therefore unauthorized as it "'could not lawfully be imposed under any circumstance in the particular case.'" (*People v. Anderson* (2020) 9 Cal.5th 946, 962.) We accordingly vacate the sentence on count 11.

DISPOSITION

The sentence on count 11 is vacated. The trial court is directed to (1) enter a corrected sentencing minute order to reflect that the sentence on count 11 is vacated, (2) amend the abstract of judgment to reflect the correction, and (3) forward copies of the corrected sentencing minute order and the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

McKINSTER
Acting P. J.

FIELDS
J.

32